**Opinion issued May 21, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NOs. 01-18-00300-CR

### 01-18-00301-CR

### 01-18-00302-CR

### and 01-18-00303-CR

_____

### TROY LEVI BURWELL, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1557904, 1557905, 1557906, 1557907**

---

# O P I N I O N

A jury convicted appellant, Troy Levi Burwell, of four counts of possession

of child pornography and assessed his punishment at imprisonment for two years in

two of the offenses and probation for ten years in the other two offenses.[1] In his sole issue on appeal, appellant argues that the trial court improperly denied his motion to suppress evidence obtained from Adobe Systems Incorporated, the entity with which appellant had electronically stored some photographs.

We affirm.

## Background

Appellant was charged with four counts of possession of child pornography after images containing child pornography were recovered from his Adobe Photoshop photo-storage account. An employee of Adobe Systems Inc. had reported the images to the National Center for Missing and Exploited Children (NCMEC), which in turn sent the tip to the Houston Police Department (HPD). HPD obtained a search warrant and conducted a further investigation, leading to appellant's arrest and prosecution.

In his motion to suppress, appellant argued that Adobe acted as an agent of NCMEC, which he asserted was a governmental entity. He "specifically invoked the protections of the Fourth, Fifth and Fourteenth Amendments to the United States

---

[1]   *See* TEX. PENAL CODE ANN. § 43.26(a). In trial court cause numbers 1557904 and 1557905, resulting in appellate cause numbers 01-18-00300-CR and 01-18-00301-CR, respectively, the jury assessed appellant's punishment at ten years' probation. In trial court cause numbers 1557906 and 1557907, resulting in appellate cause numbers 01-18-00302-CR and 01-18-00303-CR, respectively, the jury assessed appellant's punishment at two years' confinement.

Constitution; Article I, Sections 9 and 19 of the Texas Constitution, and Articles 38.22 [and] 38.23 of the Texas Code of Criminal Procedure."

At the suppression hearing, HPD Officer M. Wilson testified that he was assigned to HPD's Internet Crimes Against Children Task Force. Officer Wilson stated that he received two "Cyber Tips" from NCMEC, which he described as tips generated by an internet service provider which were then reported through NCMEC. He stated that when NCMEC receives a Cyber Tip, it then "delegate[s] [the tip] to local law enforcement for further investigation."[2] Officer Wilson identified Adobe Systems Incorporated as the internet service provider that created the tips and notified NCMEC. He stated that Adobe is a for-profit company and that it is not a law enforcement agency. Officer Wilson testified that the tips usually consist of "subscriber information" such as "a user name, an IP address, an email address, [and] possibly a phone number."

---

[2]     The parties alluded in the hearing to various laws that govern the reporting of child pornography. Federal statutes authorize NCMEC to act as "the official national clearinghouse for information about missing and exploited children," including by operating "the CyberTipline as a means of combating Internet child sexual exploitation." *See United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016) (citing 42 U.S.C. § 5773(b)). Regarding the CyberTipline, NCMEC "is statutorily obliged to maintain an electronic tipline for [internet service providers] to use to report possible Internet child sexual exploitation violations to the government," and NCMEC must "forward every single report it receives to federal law enforcement agencies and it may make its reports available to state and local law enforcement as well." *Id.* (citing 18 U.S.C. § 2258A(c)).

Officer Wilson testified that, in the present case, the tips provided appellant's Adobe user name, email address, and two different IP addresses and that the tips included four "images of interest" that had been flagged as potentially containing child pornography. Officer Wilson further stated that, in the two tips he received relevant to this case, Adobe indicated that it had reviewed the contents of the files it sent to NCMEC. Officer Wilson testified that he did not have any direct communication with Adobe, but he was aware that Adobe had user agreements with its customers and that entities like Adobe are subject to federal laws requiring that they report suspected child pornography or abuse to NCMEC. Officer Wilson was not aware of any demand or request by law enforcement made to Adobe that led to the search of appellant's account, and he stated that, to the best of his knowledge, Adobe searched appellant's account "based solely on [its] own interests." Officer Wilson testified that he did not know how Adobe came to discover the reported files in appellant's account—all he knew was that the files were not found as a result of running a "hash algorithm"[3] but that they "were actually viewed" by someone. He

---

[3]     "A hash value is an algorithmic calculation that yields an alphanumeric value for a file," essentially consisting of "a string of characters obtained by processing the contents of a given computer file and assigning a sequence of numbers and letters that correspond to the file's contents." *United States v. Reddick*, 900 F.3d 636, 637 (5th Cir. 2018), *petition for cert. filed*, No. 18-6734 (U.S. Nov. 14, 2018) (internal quotations omitted). A "hash value comparison allows law enforcement to identify child pornography with almost absolute certainty, since hash values are specific to the makeup of a particular image's data," and, thus, "[h]ash values have been used to fight child pornography distribution, by comparing the hash values of suspect files against a list of the hash values of known child pornography images currently

4

also testified that, prior to obtaining a search warrant, he did not look at or search anything beyond what Adobe had looked at and provided to NCMEC, and, to the best of his knowledge, neither did NCMEC.

Officer Wilson also testified regarding his subsequent investigation in the case. Using the IP addresses provided in the tips, he was able to determine the internet service providers to those IP addresses, and he "submitted administrative subpoenas to both [internet service providers] and requested subscriber information." This led him to appellant. Officer Wilson obtained a search warrant to examine the entire content of appellant's Adobe account and residence, and officers discovered images of child pornography associated with appellant's account, including some of the same images that were the basis of the Cyber Tips.

Finally, appellant offered copies of the CyberTipline reports and a copy of Adobe's General Terms of Use.

The Terms of Use provided, in relevant part, that users grant Adobe "a non-exclusive, worldwide, royalty-free, sub-licensable, and transferrable license to use, reproduce, publicly display, distribute, [or] modify" content uploaded to Adobe's

---

in circulation." *Id.* at 637, 639 (internal quotations omitted); *see also Ackerman*, 831 F.3d at 1294 (equating hash value with "a sort of digital fingerprint"). Although hash values are not the only method available to discover child pornography, Fourth Amendment issues involved in their use in this context has been addressed in recent cases. *See, e.g.*, *Reddick*, 900 F.3d at 637–39; *Ackerman*, 831 F.3d at 1294–95. We note, however, that the files in this case were not identified using a hash algorithm.

systems "for the purpose of operating or improving the Services."  Regarding "Our

Access," Adobe's Terms of Use provided:

> We will only access, view, or listen to your content in limited ways. For example, in order to perform the Services, we may need to access, view, or listen to your content to (a) respond to support requests; (b) detect, prevent or otherwise address fraud, security, unlawful, or technical issues; and (c) enforce these terms. Our automated systems may analyze your content using techniques such as machine learning. This analysis might occur as the content is sent, received, or when it is stored. From this analysis, we are able to improve the Services. . . .

The Terms of Use further prohibited users from using Adobe's services to

"upload or share any content that is unlawful, harmful, threatening, abusive, tortious,

defamatory, libelous, vulgar, lewd, profane, invasive of another's privacy, or

hateful" or to otherwise "violate applicable law."

The Terms of Use also contained a section regarding "Investigations" that

provided:

> 11.1 **Screening** We do not review all content uploaded to the Services, but we may use available technologies or processes to screen for certain types of illegal content (for example, child pornography) or other abusive content or behavior. . . .

> 11.2 **Disclosure** We may access or disclose information about you, or your use of the Services, (a) when it is required by law (such as when we receive a valid subpoena or search warrant); (b) to respond to your requests for customer service support; or (c) when we, in our discretion, think it is necessary to protect the rights, property, or personal safety of us, our users, or the public.

The trial court denied appellant's motion to suppress.  Among other findings

of fact, the trial court found that Adobe was not a government entity or an agent of

6

the government; the government did not request or authorize Adobe's search of appellant's account; the government did not exercise control over Adobe's search "in that the search by Adobe does not primarily help the Government but rather, serves its own interest." The trial court further clarified its finding that Adobe was not a government agent by stating, "The Court specifically finds that there is no statutory authorization of Adobe, no funding by the Government of Adobe, no licensure for the purpose of conducting these reviews of the content . . . by the service provider."

The jury subsequently convicted appellant of four counts of possession of child pornography, and this appeal followed.

### Motion to Suppress

In his sole issue on appeal, appellant argues that the trial court erred in denying his motion to suppress because Adobe's search of his account violated his rights under the Fourth Amendment.

### A.    Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion, and we review the trial court's application of the law to the facts de novo. *Id.* We give almost total deference to the trial court's determination of historical facts, especially those

7

based on an evaluation of witness credibility or demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012). We review the trial court's fact findings to determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports the findings under review. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Valtierra v. State*, 310 S.W.3d 442, 447–48 (Tex. Crim. App. 2010).

## B.      Analysis

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017) (quoting U.S. CONST. amend. IV); *see also* TEX. CONST. art. I, § 9 ("The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches. . . ."). Fourth Amendment protections generally do not extend to the conduct of private persons who are not acting as government agents or with the knowledge and participation of a government official. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *Rodriguez*, 521 S.W.3d at 10; *Dawson v. State*, 106 S.W.3d 388, 391 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("Even a wrongful search or seizure by a private citizen does not deprive the government of the right to use evidence obtained from the wrongful search.") (citing *Walter v. United States*,

447 U.S. 649, 656 (1980)).  Nevertheless, "[t]he government may not encourage conduct by private persons that the government itself cannot do, and if the government does encourage a search, or the private citizen searches solely for the purpose of aiding in law enforcement, the search is illegal." *Dawson*, 106 S.W.3d at 392.

Here, the initial search of appellant's account was done by Adobe—a for-profit company not generally associated with law enforcement. Adobe then made a report that was forwarded through NCMEC to HPD.  Officer Wilson with HPD then used information from the tips received from Adobe through NCMEC to obtain a warrant and conduct a further search of appellant's files and property.

Appellant argues that Adobe acted as an agent of NCMEC in conducting the search and inspection of the files stored with Adobe's service, and he asserts that NCMEC is a governmental entity, citing a case from the Tenth Circuit, *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016).  Regardless of whether NCMEC was acting as a governmental agency in this case, we conclude that there is no evidence that Adobe acted as an agent of either NCMEC, the HPD, or any other governmental entity.

"Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities. . . ." *Skinner v. Railway*

*Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989); *see also Ackerman*, 831 F.3d at 1301 (holding that agency relationship "is usually said to result from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act" and further recognizing "more stylized agency tests for Fourth Amendment cases" in some jurisdictions, which generally focus on government's knowledge of or control over search and aims of private party in conducting search) (internal quotations and citations omitted).

Thus, to determine whether a person is acting as an "instrument" or agent of the government, we ask (1) whether the government knew of, and acquiesced in, the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or, instead, to further his own ends. *Dawson*, 106 S.W.3d at 392 (citing *Stoker v. State*, 788 S.W.2d 1, 11 (Tex. Crim. App. 1989)). We must consider both elements. *See id.*

"We conduct our analysis of this question on a case-by-case basis in light of all the circumstances." *Id.* (citing *United States v. Hall*, 142 F.3d 988, 993 (7th Cir. 1998)); *see also Skinner*, 489 U.S. at 614 (holding that determination of extent that private party acted as government agent "can only be resolved in light of all the circumstances") (internal quotations omitted). "The defendant bears the burden of

10

proving that a private party acted as an agent of the government." *Dawson*, 106 S.W.3d at 392 (citing *United States v. Feffer*, 831 F.2d 734, 737 (7th Cir.1987)).

Regarding whether the government knew of, and acquiesced in, Adobe's intrusive conduct, there is no evidence that either NCMEC or anyone at HPD knew of or acquiesced in Adobe's search of appellant's files. In fact, Officer Wilson's testimony established that he did not learn of Adobe's search until after it had occurred. Officer Wilson affirmatively testified that he did not ask or otherwise encourage Adobe to perform the search and, to the best of his knowledge, neither did anyone at NCMEC.

As to whether Adobe performed the search intending to assist law enforcement efforts or, instead, to further its own ends, we again observe that there is no evidence that Adobe intended to assist law enforcement efforts.

Appellant argues, however, that because no one from Adobe testified at the suppression hearing, we cannot tell whether the search was entirely for its own business purposes. He further argues that because Adobe was required by law to report child pornography to authorities through NCMEC, the government essentially compelled Adobe's search.

The search of appellant's computer was provided for by Adobe's Terms of Use, which indicated that Adobe would perform routine searches of user content. The Terms of Use stated that Adobe would use the content generally for its own

11

purposes, that it would access or use content to enforce the Terms of Use themselves, and that it would "use available technologies or processes to screen for certain types of illegal content (for example, child pornography)" and would disclose information as required by law. Officer Wilson also testified that, to the best of his knowledge, Adobe acted in accordance with its own interests and not at the direction of or in cooperation with a government entity.

Thus, considering both elements necessary to determining whether Adobe acted as an "instrument" or agent of the government, we conclude that nothing in the record indicates that a governmental entity knew of and acquiesced in Adobe's search of the user content that turned up the images of child pornography in appellant's account. Nor does anything in the record indicate that Adobe acted out of anything other than its own business interests in complying with the law and maintaining the integrity of its services as set out in its Terms of Use. *See id.* Appellant failed to carry his burden of establishing that Adobe acted as an agent of the government. *See id.*

Appellant asserts that *Ackerman* is persuasive in this case. We disagree, as that case is materially distinguishable on the facts. In *Ackerman*, AOL used a hash algorithm to conduct routine screening of user emails, which resulted in AOL flagging an email and related attachments sent by Ackerman as potentially containing child pornography. 831 F.3d at 1294. AOL, without actually viewing

12

the files itself, forwarded a report to NCMEC through the CyberTipline that included Ackerman's email and the four attached images. An NCMEC analyst then opened the email and images, viewed each image, and "confirmed that all four [images] (not just the one AOL's automated filter identified) appeared to be child pornography." *Id.* The analysis also identified Ackerman as the likely owner of the account, and then alerted local law enforcement. *Id.*

Relevant here, Ackerman argued on appeal that NCMEC was a governmental entity due to the law enforcement powers delegated to it by federal statute and, as such, its warrantless search of the actual contents of the email and attachments violated his Fourth Amendment rights and implicated the "private search" doctrine in that NCMEC's investigation exceeded the scope of AOL's private search. *Id.* at 1294–95. The Tenth Circuit in *Ackerman* concluded that NCMEC was a governmental entity as it related to its involvement with Ackerman, and it further held that even if it was not a governmental entity, it could be considered an agent of law enforcement. *Id.* at 1299–1301. The *Ackerman* court further held that the scope of NCMEC's search did in fact exceed the scope of AOL's private search. *Id.* at 1304–1308.

Appellant's case here is based on significantly different facts and legal arguments from those in *Ackerman*. Here, the only warrantless search of the contents of appellant's account was done by Adobe, which actually viewed the contents of

13

appellant's files and forwarded a report containing those files to NCMEC though the CyberTipline, as compared to NCMEC's warrantless search in *Ackerman*. There is no evidence in this case that NCMEC did anything more than forward the Cyber Tips to the HPD. And Officer Wilson's uncontradicted testimony indicated that he viewed only the files that had already been viewed and flagged by Adobe prior to obtaining a search warrant, and appellant does not argue that HPD's search exceeded the scope of the private search conducted by Adobe. *But see Ackerman*, 831 F.3d at 1304–1308 (addressing Ackerman's complaint that NCMEC, acting as or on behalf of governmental entity, conducted warrantless search that exceeded scope of AOL's private search).

Rather, appellant's complaint here is that Adobe—not NCMEC—was acting as an agent of law enforcement. By contrast, the court in *Ackerman* was not asked to address and did not opine on whether the internet service provider AOL was a private party, but nevertheless referred to AOL's routine use of a hash algorithm as a "private" search. *See id.* Appellant also seems to argue that because Adobe did not use a hash algorithm to screen the content of his account, as happened in *Ackerman*, but instead had an individual screen his files, Adobe somehow violated his Fourth Amendment rights; however, nothing in *Ackerman* indicates that a private entity's review of internet content might nevertheless raise Fourth Amendment concerns if

it is done by an individual rather than by automated algorithm. *See id.* Accordingly, appellant's reliance on *Ackerman* is misplaced.

The more closely analogous case to this one is *United States v. Reddick*, 900 F.3d 636 (5th Cir. 2018), *petition for cert. filed*, No. 18-6734 (U.S. Nov. 14, 2018). In that case, the Fifth Circuit Court of Appeals concluded that an investigator's warrantless examination of files already identified by algorithm as matching known child pornography files did not materially exceed the original automated search by a private entity and so was not unconstitutional. *Id*. at 639–40.

The court pointed out that "[p]rivate businesses and police investigators rely regularly on 'hash values' to fight the online distribution of child pornography" and that "[h]ash values have thus become a powerful tool for combating the online distribution of unlawful aberrant content." *Id*. at 637. In that case, the question was "whether and when the use of hash values by law enforcement is consistent with the Fourth Amendment." *Id*. The court held that where a private company determined that the hash values of files uploaded by the defendant corresponded to the hash values of known child pornography images, and then passed those images on to law enforcement, the private search doctrine applied. *Id*. The court construed that doctrine to hold that "the Fourth Amendment is not implicated where the government does not conduct the search itself, but only receives and utilizes information uncovered by a search conducted by a private party." *Id*. It further held

15

that "the government's subsequent law enforcement actions in reviewing the images did not effect an intrusion on [the defendant's] privacy that he did not already experience as a result of the private search." *Id.*

Here, although the files identified by the Adobe employee were reviewed by both Adobe and NCMEC as images, neither Adobe nor NCMEC reviewed any file beyond those identified by Adobe, entirely unlike *Ackerman*. NCMEC simply turned the images over to law enforcement, which obtained a search warrant and conducted a search of appellant's Adobe account. Thus, here, as in *Reddick*, the government's subsequent law enforcement actions did not effect an intrusion on appellant's privacy that he had not already experienced as a result of the private search.

This case is also analogous to numerous other cases in which a private citizen found contraband or other evidence of a crime and turned it over to appropriate authorities. In *Rodriguez*, the Texas Court of Criminal Appeals provided a general overview of the private-party-search doctrine and highlighted numerous cases in which it had been applied. 521 S.W.3d at 10–11. The court observed that the "private-party-search doctrine is often applied in bailee cases in which the private person (e.g., the mechanic, the computer repairman, the airline baggage handler etc.) had legal possession of the item when he conducted the search" or in instances in which "the property is simply seized by a private person—legally or not—and turned over to the police without the police having entered a protected area." *Id.* at 11

(citing *United States v. Seldon*, 479 F.3d 340, 341 (4th Cir. 2007) (service technicians—who had legal possession of van that had been brought in for repair—found false compartment and turned over evidence); *Rogers v. State*, 113 S.W.3d 452, 454–55 (Tex. App.—San Antonio 2003, no pet.) (computer technician finds files containing child pornography on computer voluntarily relinquished to computer repair store); *Cobb v. State*, 85 S.W.3d 258, 270–71 (Tex. Crim. App. 2002) (holding that Fourth Amendment was not implicated when private citizen took knives from his son's apartment); *Stone v. State*, 574 S.W.2d 85, 87 (Tex. Crim. App. [Panel Op.] 1978) (Stone's babysitter gathered photographs depicting sexual assault from Stone's residence and gave them to housing manager, who in turn gave them to police)).

And, here, also unlike *Ackerman*, appellant used Adobe's services pursuant to its Terms of Use, and these put him on notice that Adobe reviews files stored on its website for indicia of crimes, specifically including child pornography. Thus, Adobe had lawful access to appellant's stored content at the time it conducted its search. *See id.* There is no evidence that the search was done with the government's knowledge or to assist with law enforcement efforts. *See id.*; *Stoker*, 788 S.W.2d at 11; *Dawson*, 106 S.W.3d at 392. There is no evidence that it violated the Fourth Amendment. Rather, considered in light of this Fourth Amendment jurisprudence, the record demonstrates that Adobe acted as a private entity in conducting its search

17

of appellant's account and that its search did not implicate appellant's Fourth Amendment rights.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Publish.  TEX. R. APP. P. 47.2(b).